UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MAUREEN K. FEGER,                    )
                                     )
                  Plaintiff,         )
                                     )
         v.                          )    No.  4:08CV1175 FRB
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
                  Defendant.         )

**MEMORANDUM AND ORDER**

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On March 11, 2005, plaintiff Maureen K. Feger filed an application for Disability Insurance Benefits pursuant to Title II, 42 U.S.C. §§ 401, et seq., and an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., in which she alleged that she became disabled on July 20, 2004. (Tr. 29-31, 77-79.) On initial consideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 39, 61-66.) On October 12, 2006, upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 469-88.) Plaintiff testified and was represented by counsel. A vocational expert also testified

at the hearing.  On December 20, 2006, the ALJ issued a decision denying plaintiff's claims for benefits.  (Tr. 9-22.)  On June 25, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 4-7.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on October 12, 2006, plaintiff testified in response to questions posed by the ALJ and counsel.  At the time of the hearing, plaintiff was forty-three years of age.  Plaintiff is a high school graduate.  (Tr. 471.)  Plaintiff has one adult child.  Plaintiff also has three minor children, one of whom lives with her and two of whom she has joint custody with their father.  (Tr. 477.)  Plaintiff's fiancé and his daughter also live with plaintiff.  (Tr. 483.)  Plaintiff previously received short-term disability through her work, with the last of such payments received in January 2005.  (Tr. 472-73.)

From 1989 to 1997, plaintiff was co-owner of Mike's Boat Repair, overseeing the tackle shop of the business and acting as office manager.  From 1997 to July 2004, plaintiff worked as a tow motor operator at Graham Packaging.  For five weeks in 2003, plaintiff worked for Anderson News as a laborer in the returns department.  (Tr. 85.)

Plaintiff testified that she is unable to work full time because of problems with her legs, balance, and numbness in her head. (Tr. 473.) Plaintiff testified that she has had a constant pins-and-needles sensation in her hands, feet, arms, legs, lips, and face during the previous six years. Plaintiff testified that she learned to get used to the sensation. Plaintiff testified, however, that she also experiences numbness in her head which results in an inability to function. (Tr. 477-78.) Plaintiff testified that it feels as though her brain is asleep and she just stares off into space. (Tr. 478.) Plaintiff testified that the numbness occurs every two weeks and lasts two or three days. Plaintiff testified that, during these episodes, her speech is slow and slurred and she sleeps a lot. (Tr. 473, 478.) Plaintiff testified that her symptoms are triggered by heat, lack of sleep, and stress. (Tr. 479.) Plaintiff testified that she went to the Mayo Clinic for her condition and was told that her symptoms were the result of electric shock. (Tr. 473-74.) Plaintiff testified that the Mayo Clinic told her of a physician in Florida who specializes in such conditions, but that she is unable to go to Florida due to lack of income. Plaintiff testified that she previously saw a psychiatrist for her condition but was told that she had no mental problems and that her condition was physical in nature. (Tr. 474.)

Plaintiff testified that she experiences tremors which

cause difficulty with walking and balance. Plaintiff testified that she used to have such episodes on a daily basis and that they would last for hours. Plaintiff testified that she now takes Neurontin which helps the condition in that the episodes now occur approximately once a month and last for fifteen minutes to half an hour. (Tr. 478.) Plaintiff testified that these symptoms as well are triggered by heat, lack of sleep, and stress. (Tr. 479.)

Plaintiff testified that she previously believed that she had multiple sclerosis given her symptoms and her sister having been diagnosed with the condition. (Tr. 474.) Plaintiff testified that various diagnostic tests yielded negative results. Plaintiff testified, however, that during such testing, it was discovered that she had a bulging disc at the T11-12 level. (Tr. 475.)

Plaintiff testified that she smoked marijuana in 2004 to help alleviate pain because none of her medications were working. Plaintiff testified that she used marijuana once a week and that it helped her pain. Plaintiff testified that she stopped using marijuana in March 2006 because her physician prescribed a different medication, Trazodone, which alleviated approximately eighty percent of her pain. (Tr. 475-76.) Plaintiff testified that she recently began experiencing muscle contraction in her hamstrings and calves and thus increased her dosage of Trazodone. (Tr. 476.) Plaintiff testified that her increased dosage of Trazadone has resulted in a decrease of her pain from a level eight

to a level four or five on a scale of one to ten, but that she is also quite tired. (Tr. 476, 479.)

Plaintiff testified that she has trouble concentrating and remembering things, and experiences increased difficulty during episodes of numbness in her head. (Tr. 479-80.) Plaintiff testified that she experiences fatigue and sometimes falls asleep without notice. Plaintiff testified that she usually takes naps approximately four days a week. (Tr. 480.)

As to exertional abilities, plaintiff testified that she can walk around the block on a good day, but that she is limited in her ability to walk from room to room on a bad day due to pain. Plaintiff testified to her belief that she could stand without assistance for up to half an hour, but would experience problems with balance if she had to stand for longer periods. (Tr. 481.) Plaintiff testified that she can sit for up to two hours before having to get up and use the restroom.[1] Plaintiff testified that she has difficulty climbing stairs, and with bending and stooping. Plaintiff testified that she was recently bending while working in her garden and fell because she became overheated and her legs knotted up. (Tr. 482.) Plaintiff testified that she also experiences weakness and sometimes cannot lift a gallon of milk. (Tr. 480.)

As to her daily activities, plaintiff testified that she

_____

[1]Plaintiff testified that she currently takes medication for a bladder condition. (Tr. 482.)

wakes in the morning between 7:00 and 9:00 a.m. Plaintiff testified that she no longer has difficulty sleeping since taking Trazadone. (Tr. 483-84.) Plaintiff testified that upon waking, she takes care of the dog, prepares herself some tea, turns on the television, and then plays games on the computer to keep her mind busy. Plaintiff testified that if her legs are not bad, she will try to get up and do something, such as fix breakfast or clean the dishes. Plaintiff testified that she rests for approximately six hours out of an eight-hour period during the day because of her fatigue. (Tr. 484.) Plaintiff testified that she does not drive often and drives only short distances. (Tr. 481.) Plaintiff testified that her sister and fiancé try to take her out for about an hour or two. Plaintiff testified that they go fishing several times during the summer in an effort for plaintiff just to get out. Plaintiff testified that she sometimes has difficulty showering during her episodes of numbness and because of balance problems. (Tr. 482.) Plaintiff testified that her children help with the housework, but that she always cleans the bathroom. Plaintiff testified that she goes grocery shopping but has someone with her to assist her. (Tr. 483.)

B.   Testimony of Vocational Expert

Brenda Young, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ first asked Ms. Young to assume an individual

forty-one years of age with a high school education and the same
work history as plaintiff. The ALJ asked Ms. Young to further
assume the individual to be able to

> lift and carry up to 50 pounds occasionally,
> 25 pounds frequently; sit for six hours out of
> eight, stand or walk for six hours out of
> eight; can occasionally climb ropes, ladders
> and scaffolds; and should avoid moderate
> exposure to the hazards of moving and
> dangerous machinery, and unprotected heights.
> She is able to understand, remember and carry
> out at least simple instructions, and non-
> detailed tasks; and can perform some complex
> tasks as well.

(Tr. 485.)

Ms. Young testified that such a person could not perform
plaintiff's past relevant work other than her limited work
involving magazine returns. (Tr. 485.) Ms. Young testified that
such a person could perform other medium, unskilled work, such as
hand-packager, of which 9,000 such jobs exist in the St. Louis
region; and machine operator, of which 3,500 such jobs exist in the
St. Louis region. (Tr. 486.)

The ALJ then asked Ms. Young to assume the individual was
limited to lifting and carrying up to twenty pounds occasionally
and ten pounds frequently. Ms. Young testified that such a person
could perform light, unskilled work, such as retail sales, of which
40,000 such jobs exist in the St. Louis region; and counter
attendant or dining room helper, of which 5,000 such jobs exist in

the St. Louis region.  (Tr. 486-87.)

        The ALJ then asked Ms. Young to assume a person described by plaintiff in her testimony, that is, a person who "was unable to sit, stand or walk for a combination of eight hours a day[.]"  Ms. Young testified that no work was available on a full time basis for such a person.  (Tr. 487.)

        Counsel asked Ms. Young to consider a person who needed to rest three to four hours in an eight-hour workday.  Ms. Young testified that such a person could not work on a sustained, full-time basis.  (Tr. 487.)

### III.  Medical Records

        Plaintiff visited Dr. Mel E. Lucas on October 19, 2000, and reported that she began experiencing numbness the previous night at work, with such numbness beginning in her head and then spreading to her arms and legs.  Plaintiff reported that she became very tired and weak.  Plaintiff reported that she went to the emergency room and that tests performed there were normal. Plaintiff also complained of headaches.  Physical examination performed by Dr. Lucas was normal.  Plaintiff's gait and range of motion were noted to be normal.  Dr. Lucas prescribed Cipro[2] for plaintiff and ordered various diagnostic tests to determine the etiology of plaintiff's symptoms.  (Tr. 167.)

--------

        [2]Cipro is indicated for the treatment of infections. Physicians' Desk Reference 848 (55th ed. 2001).

On October 20, 2000, plaintiff underwent an MRI of the brain in response to her complaints of dizziness and numbness. The results of the MRI were normal. (Tr. 172.)

Plaintiff returned to Dr. Lucas on October 24, 2000, and reported that her numbness and lightheadedness had not improved. Plaintiff complained that she was really tired all of the time and that she experiences numbness all over, but especially in her arms and legs. Plaintiff reported that she has episodes during which she feels she might pass out. (Tr. 167.) Upon plaintiff's request, Dr. Lucas permitted her to return to work but restricted her from working at heights and from operating heavy machinery. (Tr. 166.)

On November 6, 2000, plaintiff underwent an MRI of the cervical spine in response to her complaints of numbness and tingling in the arms and legs bilaterally. The results of the MRI were normal. (Tr. 171.)

Plaintiff returned to Dr. Lucas on November 9, 2000. Plaintiff reported that she experiences lightheadedness on a daily basis but that she does not pass out completely. Plaintiff reported her episodes not to be associated with any one thing. Plaintiff reported having a rare headache and that she feels as though her equilibrium is off. Plaintiff reported experiencing numbness and tingling at the base of her head and in her arms, legs, feet, and hands. Physical examination was unremarkable.

Reflexes were 2+ and strength was 5/5 bilaterally. Neurological testing was intact with no deficits. Dr. Lucas noted all diagnostic testing thus far to be negative. It was noted that plaintiff was scheduled for holter monitor testing. Plaintiff was instructed to follow up in the office. (Tr. 166.)

An ECG performed on November 9, 2000, was normal. (Tr. 170.) Holter monitor testing performed on November 15 and 16, 2000, showed no arrhythmia. (Tr. 168-69.)

Plaintiff returned to Dr. Lucas on November 17, 2000, and complained of continued lightheadedness. Plaintiff reported that she still continued to experience numbness all of the time all over her body. Plaintiff reported her family history of diabetes mellitus, fibromyalgia, and multiple sclerosis (MS). Plaintiff reported that she occasionally has problems with her left ankle due to a previous injury. Plaintiff also complained of stiffness in her mid back. Physical examination showed tenderness at ten of fourteen trigger points for fibromyalgia. Dr. Lucas diagnosed plaintiff with lightheadedness, numbness, and fibromyalgia. Additional testing was ordered and Zoloft[3] was prescribed. (Tr. 165.)

On November 22, 2000, plaintiff reported to Dr. Lucas that she continued to have episodes of lightheadedness without

_____

[3]Zoloft is indicated for the treatment of depression, Physicians' Desk Reference 2553-54 (55th ed. 2001), and is sometimes used to treat headaches, Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.

passing out. Plaintiff reported her episodes to improve after about one hour. Plaintiff also complained of continued numbness. Dr. Lucas noted that plaintiff drove a forklift at work. Plaintiff reported that she experienced no real change with Zoloft. Physical examination was noted to be unchanged. Dr. Lucas diagnosed plaintiff with lightheadedness and ordered more testing. Dr. Lucas also diagnosed plaintiff with fibromyalgia and instructed plaintiff to continue with Zoloft. (Tr. 165.)

On November 28, 2000, plaintiff underwent an echocardiogram for evaluation of history of presyncopal episode. Normal LV systolic function was noted. There was no evidence of bicuspid aortic valve or aortic stenosis. Trivial mitral regurgitation and mild tricuspid regurgitation were noted. (Tr. 159.)

Plaintiff reported to Dr. Lucas on November 29, 2000, that she felt worse. Plaintiff continued to complain of numbness, tingling, and fatigue. Dr. Lucas noted recent test results to be negative. (Tr. 165.) During an office visit on December 1, 2000, plaintiff continued to complain of worsening symptoms of numbness, weakness, and fatigue. Plaintiff reported that she wanted to sleep all of the time, and was depressed over not being diagnosed. Dr. Lucas noted plaintiff to appear depressed, with a flat affect. Plaintiff also appeared fatigued. Physical examination was unremarkable. Strength was measured to be 5/5 in both upper and

lower extremities. Reflexes were 2+. Dr. Lucas diagnosed plaintiff with paresthesias and weakness. Dr. Lucas also believed plaintiff suffered from depression and recommended that she obtain a second opinion. Paxil[4] was prescribed. Zoloft was discontinued. Plaintiff was told that she could return to work. (Tr. 164.)

On December 15, 2000, plaintiff reported to Dr. Lucas that she continued to experience tingling all over, but that she had no episodes of lightheadedness for two days. Plaintiff reported that she stopped taking Paxil because of its side effects, but that she felt good. Plaintiff requested a note to allow her to return to work. (Tr. 164.)

Plaintiff visited Dr. Stephen G. Sanders on January 19, 2001, and complained of having experienced tingling all over her body for four months. Plaintiff reported the sensation to be mild except in her hands where she experiences weakness and the sensation that the hands are asleep. Plaintiff also reported having episodes of lightheadedness occurring multiple times weekly and lasting up to twelve hours. Plaintiff identified no triggering events for these episodes. Physical examination was essentially unremarkable. Dr. Sanders noted plaintiff to have a normal gait and to be able to sit and stand without difficulty. Phalen's test and Tinel's test of the extremities were positive. Dr. Sanders

_____

[4]Paxil is used to treat depression, panic disorder, obsessive compulsive disorder, and social anxiety disorder. Physicians' Desk Reference 3114-16 (55th ed. 2001).

determined the hand numbness/tingling to be consistent with carpal tunnel. Dr. Sanders noted there to be no unifying diagnosis for the "whole body tingling" and opined that the episodes of lightheadedness were likely vasovagal. Dr. Sanders also opined that plaintiff may have experienced orthostatic hypotension. Dr. Sanders determined for plaintiff to undergo EMG and nerve conduction studies as well as laboratory testing. Plaintiff was instructed to follow up in two months. (Tr. 364-65.)

Plaintiff visited Dr. Carey Fredman of Midwest Heart Rhythm on January 29, 2001, with complaints of experiencing numbness and tingling over her entire body for four months. It was noted that diagnostic examinations, including MRI, echocardiogram, holter monitor, and blood tests, were normal. Plaintiff described episodes of lightheadedness while either sitting or standing, and reported that lying down relieved this sensation. Plaintiff also reported that taking Meclizine,[5] which had been given to her in an emergency room, also seemed to help her lightheadedness. Plaintiff reported experiencing recent fatigue and some blurred vision. Plaintiff reported generalized weakness and cold intolerance. Review of the remaining systems was unremarkable. Physical examination showed plaintiff to be obese but was otherwise unremarkable. Dr. Fredman expressed uncertainty as to the cause of

---

[5]Meclizine is indicated for the management of nausea and vomiting, and dizziness associated with motion sickness. Physicians' Desk Reference 2469 (55th ed. 2001).

plaintiff's numbness and tingling, and he recommended that plaintiff undergo a tilt table test. (Tr. 161-62.)

On February 2, 2001, plaintiff underwent a nerve conduction study (NCS) in response to her complaints of numbness and tingling in her hands and legs. Examination showed temperature and vibratory sensation to be intact in the upper and lower extremities. Muscle bulk was noted to be intact. Results of the NCS showed no electrodiagnostic evidence of motor or sensory neuropathy. (Tr. 310.)

Plaintiff underwent a tilt table test on February 6, 2001, the results of which were negative. (Tr. 160.)

Upon referral from Dr. Sanders, plaintiff visited neurologist Dr. K. Philip Lee on February 22, 2001, for evaluation of her complaints of whole body paresthesias and lightheadedness. Plaintiff reported having experienced paresthesias involving both sides of her face, arms and legs since October 2000; and of having intermittent spells of lightheadedness while sitting or standing, having no association with movement. Plaintiff reported these spells to last twelve to fourteen hours. Plaintiff reported her symptoms to worsen if she gets cold. Plaintiff reported no other symptoms. Dr. Lee noted plaintiff to take Meclizine, which plaintiff reported to help with dizziness. It was also noted that plaintiff took Florinef.[6] Examination showed plaintiff to be

---

[6]Florinef is used to help control the amount of sodium and fluids in the body. Medline Plus (last reviewed Sept. 1, 2008)

mildly obese, in no acute distress. No nystagmus was noted. Plaintiff had no facial weakness, but mild tingling bifacially was noted. Motor examination was unremarkable. Plaintiff's strength was noted to be intact in all extremities. Plaintiff reported having a mild pins-and-needles sensation in her arms and legs. Dr. Lee noted, however, that plaintiff had no diminution of sensation and had intact vibration and joint position sense. Finger-to-nose testing was performed without ataxia. Plaintiff was noted to have a steady gait. Plaintiff was able to walk on her toes and heels, as well as tandem walk. Upon review of the examination and various diagnostic tests all yielding negative results, Dr. Lee reported that a unifying diagnosis was not clear and that there were no specific features or evaluation to suggest the presence of a neurological disorder. Dr. Lee remarked on his inability to think of other tests to perform and opined that plaintiff's symptoms may resolve on their own in time inasmuch as there was no anatomic or physical abnormality noted in her multiple tests. Plaintiff expressed frustration at the lack of diagnosis, and Dr. Lee suggested that plaintiff get a second opinion from an entity such as Mayo Clinic, but opined that the "utility of that would not be high." (Tr. 303.) Dr. Lee had no further recommendations. (Tr. 304.)

Plaintiff returned to Dr. Sanders on February 23, 2001,

<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682549.html>.

and reported that she experienced no improvement with her dizziness and continued to experience dizziness on a regular basis upon standing. Dr. Sanders noted there to be a component of vertigo present but that such symptom was intermittent and independent of other symptoms. Plaintiff reported Florinef not to have helped. Dr. Sanders noted plaintiff to also take Meclizine. Physical examination was unremarkable. Neurological examination showed plaintiff to be mildly ataxic. Dr. Sanders noted plaintiff to have a peculiar head bob and tremor in the right upper extremity while seated. Sensory, strength and reflex examinations were normal. Dr. Sanders noted plaintiff to have positive Romberg's test and that she held on to the wall while ambulating. Dr. Sanders noted there to be no change in plaintiff's paresthesia. Dr. Sanders determined to increase plaintiff's dosage of Florinef and considered prescribing Prozac or beta-blockers. Plaintiff was instructed to remain off of work until further notice and was advised that she may have to change jobs. Plaintiff was instructed to return in one month for follow up. (Tr. 361.)

Plaintiff returned to Dr. Lee on March 1, 2001, with complaints of recent onset of head bobbing. Plaintiff reported that the condition goes away if someone hugs her or if she squeezes the back of her head. No tremor was noted in the extremities. Plaintiff also continued to complain of generalized paresthesias. Examination showed plaintiff to have a mild head-bobbing-type of

tremor which was noted to come and go.  Dr. Lee questioned whether the tremor became more pronounced when plaintiff was self-conscious of it.  No limb or truncal ataxia was noted.  Plaintiff had a normal gait.  Dr. Lee questioned whether the head bobbing was the onset of an essential tremor.  Dr. Lee determined for plaintiff to undergo a repeat MRI.  Dr. Lee determined to treat plaintiff as though she had an essential tremor, and he prescribed Mysoline.[7] (Tr. 300-01.)

Plaintiff visited Dr. Sanders on March 19, 2001, and reported some subtle improvement in her symptoms.  Plaintiff indicated that she wanted to return to work.  Plaintiff reported a continued feeling of lack of equilibrium but reported her dizziness to have improved.  Dr. Sanders questioned whether plaintiff's improvement was due to the addition of Mysoline.  Neurological examination showed plaintiff to have mild ataxia with ambulation and to have positive Romberg's test.  Examination of the cranial nerves was normal.  Dr. Sanders questioned whether plaintiff had ataxia or vertigo.  Dr. Sanders continued in his observation of plaintiff's paresthesias.  Dr. Sanders noted that plaintiff was to be seen for a second opinion.  Plaintiff was instructed to stop Florinef, to continue with Mysoline, and to return for follow up in three to four months.  (Tr. 360.)

---

[7]Mysoline is used to control certain types of seizures.  Medline Plus (last revised June 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682023.html>.

On March 29, 2001, plaintiff visited Dr. G. Robert Kletzker of Ear Care & Skull Base Surgery, Inc., in relation to her five-month history of recurring bouts of imbalance and a constant sense of lightheadedness aggravated by head motion. Plaintiff also complained of near fainting spells and of developing dyskinesias, head bobbing, and poor control of muscle function. Dr. Kletzker noted diagnostic testing to have been negative. It was noted that plaintiff was scheduled for an upcoming cerebral spinal fluid test. Physical examination showed rhythmic head bobbing and cervical cranial torsion, but was otherwise unremarkable. Finger-nose-finger testing was intact without tremors. Plaintiff's gait was noted to be slow and cautious, but plaintiff performed tandem fairly well. Dr. Kletzker suspected that plaintiff's central disequilibrium was related to her neuromuscular abnormalities. Dr. Kletzker recommended studies to rule out MS, lyme disease, or heavy metal poisoning. Dr. Kretzker advised that plaintiff need not follow up with him unless the recommended studies were negative, which would thus indicate further testing. (Tr. 163.)

Dr. Stuart Weiss examined plaintiff on April 26, 2001, in relation to her complaints of paresthesias, lightheadedness, intermittent head jerking and bobbing, and imbalance. Plaintiff reported that she was frustrated with her increased fatigue and inability to function, and that she had been unable to work for the past six months. Plaintiff reported a remote history of

depression.  Physical examination as to muscle strength, sensation, coordination, and deep tendon reflexes was unremarkable.  No abnormality was initially noted with regard to plaintiff's gait; however, plaintiff began to jerk and twitch while undergoing testing for balance in the examination room.  Plaintiff had normal tandem gait, however, and was able to stand on one foot for ten to fifteen seconds with her eyes closed.  Some tremors were also noted, but they disappeared with activity.  Dr. Weiss noted there to be no objective neurological deficit other than nystagmus which, Dr. Weiss opined, may be related to plaintiff taking Mysoline to control her head tremor.  Dr. Weiss opined that plaintiff may have masked depression with multifocal somatic symptoms.  Plaintiff was given Celexa[8] and was instructed to follow up in six weeks.  (Tr. 311-12.)

Plaintiff returned to Dr. Sanders on May 8, 2001, for evaluation of persistent numbness, tingling, dizziness, and occasional palpitations.  Dr. Sanders noted the negative results of diagnostic testing.  Dr. Sanders further noted Dr. Weiss's suggestion that plaintiff take Prozac for somatoform disorder.  Dr. Sanders noted plaintiff to vehemently deny being depressed and insisted that something was wrong.  Physical examination was unremarkable.  Neurological examination was "entirely normal."  Dr. Sanders opined that plaintiff had probable somatoform disorder.

---

[8]Celexa is indicated for the treatment of depression. Physicians' Desk Reference 1258 (55th ed. 2001).

Dr. Sanders gave plaintiff samples of Effexor[9] and suggested that she seek a psychiatric opinion.  (Tr. 359.)

On August 21, 2001, plaintiff visited Dr. John E. Tessier of Mid County Orthopaedic Surgery and Sports Medicine for evaluation of an injury which occurred on August 19, 2001.  It was noted that plaintiff was in a go-cart accident in which the go-cart flipped and plaintiff landed on her left side, shoulder, and neck. Plaintiff currently reported pain in her left shoulder and cervical spine unrelieved by Vicodin.[10]  Plaintiff also reported that she had difficulty sleeping at night.  Dr. Tessier noted plaintiff to have no significant medical history.  Physical examination showed limited range of motion about the neck with tenderness to the cervical spine to palpation as well as along the medial scapular border.  The left scapula was noted to be tender and an abrasion was noted.  Other than showing a straightening of the cervical spine, x-rays were negative.  Dr. Tessier diagnosed plaintiff with strain to the cervical spine as well as contusion and crush injury to the left shoulder.  Dr. Tessier recommended that plaintiff take anti-inflammatory medication and muscle relaxants and apply ice and heat to the affected areas.  Dr. Tessier instructed plaintiff to remain off work for two weeks and to return to his office at that

_____

[9]Effexor is used to treat depression.  Physicians' Desk Reference 3361 (55th ed. 2001).

[10]Vicodin is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1629-30 (55th ed. 2001).

time for follow up.  (Tr. 187.)

Plaintiff visited Dr. Sanders on December 12, 2002, and complained of a lump on her ankle.  It was noted that plaintiff worked as a forklift driver and sometimes worked a second job.  Plaintiff also reported persistence in paresthesias of her hands, feet and face since January 2001.  Plaintiff also reported feeling some fatigue.  It was noted that plaintiff did not exercise and had gained weight.  Physical examination showed a tender inflammatory nodule in the left Achilles tendon.  Otherwise, physical and neurological examination was unremarkable.  Plaintiff was diagnosed with Achilles tendinitis, and paresthesias of unclear etiology.  Laboratory testing was ordered and plaintiff was instructed as to diet, exercise, and sleep habits.  Plaintiff was also instructed as to stretching of the Achilles and to take Aleve.  (Tr. 358.)

Laboratory testing performed on December 18, 2002, yielded normal results.  (Tr. 299.)

Plaintiff was admitted to St. John's Mercy Medical Center on February 3, 2003, after having experienced multiple spells of nonresponsiveness and head shaking during the previous two days.  It was determined that plaintiff would undergo EEG, MRI and MRA testing.  (Tr. 305.)  Dr. Lee examined plaintiff on that same date and noted plaintiff's complaints of multiple spells of altered level of consciousness and dizziness.  Plaintiff reported having paresthesias, head bobbing and head shaking.  Dr. Lee noted

plaintiff not to be taking any medication. Examination showed plaintiff's speech to be fluent. Plaintiff had no facial weakness or numbness. Plaintiff's strength was noted to be intact with normal tone and bulk. Sensory examination showed diffuse paresthesias all over. Deep tendon reflexes were 1+ bilaterally. Plaintiff was able to perform finger-to-nose coordination testing without ataxia. (Tr. 309.) During EEG testing, plaintiff experienced multiple spells of not responding as well as head bobbing or shaking; however, the EEG was unremarkable in that a normal background rhythm was maintained with no evidence of electrographic seizures. (Tr. 297.)

Dr. Sanders examined plaintiff on February 4, 2003, and noted that overnight EEG testing showed five or six spells, sometimes severe, but that such spells were not consistent with epileptiform activity. Plaintiff reported head-to-toe paresthesias throughout the day, but Dr. Sanders noted that such condition did not prevent her from performing her nighttime work as a forklift driver. Plaintiff was noted to currently be taking Effexor. Physical examination was normal. Dr. Sanders opined that plaintiff had spells "which are stereotyped" and which he considered "as vasovagal or psychologically based." (Tr. 306.) Dr. Sanders also noted there to be no physiologic explanation for plaintiff's paresthesias. Dr. Sanders determined for plaintiff to undergo MRI and MRA testing and to follow up with Dr. Lee and himself. (Tr.

307.)

An MRI of the brain performed on February 4, 2003, showed no significant abnormality. (Tr. 319.) An MRI/angiogram of the neck performed that same date showed mild plaque in both carotid arteries, but without significant flow limitation. (Tr. 317.)

Plaintiff was discharged from St. John's Mercy on February 4, 2003, with instruction not to drive. (Tr. 298.)

Plaintiff returned to Dr. Sanders on February 24, 2003, and reported that her episodes of syncope had nearly resolved. Plaintiff reported occasional dizziness. Plaintiff indicated that she would like to go back to work. Dr. Sanders noted plaintiff to have an appointment with a psychiatrist to rule out any psychological input on her symptoms. Physical and neurological examination was normal, with normal gait and normal sensory, strength and reflex examinations. It was noted that plaintiff requested to see a vascular surgeon regarding her circulation. Dr. Sanders opined that, given the series of negative tests thus far, a sural nerve biopsy should be considered to rule out treatable causes of neuropathy. Plaintiff was instructed to return in two months. (Tr. 356.)

On March 6, 2003, plaintiff visited Dr. Joseph J. Hurley at West County Surgical Specialists who noted plaintiff to have "a very bizarre" medical history, which included hands and legs going to sleep, legs hurting while walking, fainting spells, and

hypotension. It was noted that plaintiff experienced these conditions for two and one-half years. Dr. Hurley also noted plaintiff to have a history of equilibrium problems as well as head bobbing. Physical examination was unremarkable. It was noted that plaintiff had normal speech and normal gait. Cranial nerves were grossly intact. It was noted that plaintiff had been requested to see a psychiatrist. Upon conclusion of the examination, Dr. Hurley suggested that plaintiff undergo treadmill testing to

> make certain that there is no occult underlying peripheral arterial disease. She has obviously been well worked up for the possibility of cerebrovascular disease. If there is no evidence of peripheral arterial disease, I do not have any other understanding of what is going on with her.

(Tr. 190.)

Plaintiff visited psychiatrist Dr. Scott J. Arbaugh on March 31, 2003. Upon examination, Dr. Arbaugh determined there to be no evidence of any psychopathology, noting plaintiff not to "appear to have any type of a mood disorder, anxiety disorder or psychotic disorder." Dr. Arbaugh recommended that plaintiff discontinue Effexor inasmuch as it had been ineffective. Dr. Arbaugh noted plaintiff to have worked making lead weights in the past, and opined that such exposure to lead may be of some significance in determining the etiology of her complaints. (Tr. 191, 294-96.)

Plaintiff returned to Dr. Sanders on April 17, 2003, and reported that her symptoms had worsened. Plaintiff reported being dizzy all day, every day, and that she must take off work because of it. Plaintiff also reported numbness and tingling from head to toe. Plaintiff reported being depressed and angry about her illness. Plaintiff was convinced that she had MS. Physical and neurological examination showed no evident symptoms. Dr. Sanders concluded that plaintiff had somatic symptoms, not consistent with neurologic disease; and probable fibromyalgia. Additional diagnostic testing was scheduled. Dr. Sanders noted Dr. Lee to have given plaintiff Amitriptyline[11] the previous day. Dr. Sanders recommended that plaintiff titrate the dose for two weeks. (Tr. 355.)

An MRI of the cervical spine performed on April 18, 2003, was unremarkable. (Tr. 315.)

In a letter to Dr. Sanders dated May 2, 2003, Dr. Lee reported that he provided an option to plaintiff that she undergo further evaluation or proceed with symptomatic treatment, of which she chose further evaluation. Dr. Lee reported that plaintiff therefore underwent lumbar puncture and further laboratory testing, all of which yielded negative results. Dr. Lee reported that upon

---

[11]Amitriptyline is used for the relief of symptoms of depression, <u>Physicians' Desk Reference</u> 626 (55th ed. 2001), but is also sometimes used to treat post-herpetic neuralgia, <u>Medline Plus</u> (last revised May 1, 2009)<<u>http://www.nlm.nih.gov/medlineplus/</u> druginfo/medmaster/a682388.html>.

advising plaintiff of these results, plaintiff indicated that her symptoms were improving. Dr. Lee reported that he instructed plaintiff to call him if her symptoms worsened and if she wanted to proceed with symptomatic treatment. (Tr. 293.)

Plaintiff returned to Dr. Sanders on June 3, 2003, for symptoms including cough, fever and nasal congestion. Dr. Sanders noted plaintiff to still be working. Plaintiff was diagnosed with viral gastroenteritis and was instructed as to diet and fluid intake. (Tr. 354.)

Plaintiff visited endocrinologist Dr. Irini Veronikis on June 22, 2003, in relation to her symptoms of paresthesias in her arms, legs, lips, and face; numbness; lightheadedness; fatigue; loss of balance; tremors; twitching; and myoclonus.[12] It was noted that plaintiff's symptoms had recently improved, but that "a viral infection brought everything back to the surface." It was noted that plaintiff took no medications. Physical examination was unremarkable. Examination of the head and neck was normal. Laboratory testing yielded normal results. Dr. Veronikis suggested that plaintiff be evaluated for sleep apnea given her tiredness and history of snoring. It was also recommended that plaintiff discontinue caffeine intake due to her irritability and

---

[12]Myoclonus refers to sudden, involuntary jerking of a muscle or group of muscles. Myoclonus generally is not a diagnosis of a disease but rather describes a symptom. Medline Plus, National Institute of Health (last updated Dec. 11, 2007)<http://www.ninds. nih.gov/disorders/myoclonus/detail_myoclonus.htm>.

lightheadedness.  (Tr. 194.)

Plaintiff visited rheumatologist Dr. Robert J. Schneider on January 5, 2004.  Plaintiff complained of face pain; tingling in her hands, arms, feet, and legs; leg spasticity; equilibrium problems; numbness in the back of her head; tremors; and episodes of lightheadedness.  Plaintiff reported that she currently worked as a tow motor operator approximately fifty hours a week.  (Tr. 208.)  Plaintiff reported that she was last hospitalized in February 2003 for syncope and that she currently had diffuse musculoskeletal pain which caused difficulty with walking. Plaintiff reported having poor sleep.  It was noted that plaintiff worked at night and slept fitfully during the day, but that her sleep was okay on the weekends.  Dr. Schneider noted plaintiff's past medications.  (Tr. 207.)  Physical examination was unremarkable.  Dr. Schneider noted there to be no trigger point tenderness.  Dr. Schneider noted plaintiff to speak with minimal motion of the mouth until she was distracted whereupon her facial motion became more normal.  (Tr. 205-06.)  Dr. Schneider opined that plaintiff had somatization disorder and did not have typical fibromyalgia.  Dr. Schneider considered prescribing Neurontin for symptom control and questioned whether plaintiff should be referred to a pain clinic for evaluation.  (Tr. 206.)

In a letter to plaintiff dated March 1, 2004, Dr. Schneider noted plaintiff's prior medical records and multiple

diagnostic tests to yield normal results. Dr. Schneider stated that he could not make a diagnosis of any primary rheumatologic disorder and that plaintiff's symptom complex did not fit the typical category of fibromyalgia syndrome. Dr. Schneider noted that he had previously suggested a trial of Neurontin for symptom control, and recommended that plaintiff undergo repeat testing. (Tr. 218.)

Plaintiff returned to Dr. Schneider on April 4, 2004, who noted plaintiff's present illness to be somatization disorder. Physical examination was normal. Additional testing was ordered and plaintiff was prescribed Neurontin.[13] Plaintiff was instructed to return in one month. (Tr. 203-04.)

An EMG and NCS performed April 14, 2004, showed no significant abnormalities. (Tr. 217.)

Plaintiff visited Dr. Schneider on May 6, 2004, and reported her tremors to be quiet. Dr. Schneider questioned whether this was the effect of Neurontin. Plaintiff also reported that her muscle cramps had decreased and that her facial pain was less intense. Dr. Schneider noted some fatigue and questioned whether it was related to plaintiff's work schedule and/or medications. Physical examination was normal. Dr. Schneider continued in his

_____

[13]Neurontin is used as adjunctive therapy in the treatment of partial seizures, Physicians' Desk Reference 2458-59 (55th ed. 2001), as well as to relieve the pain of post-herpetic neuralgia. Medline Plus (last revised June 1, 2008)<http://www.nlm.nih. gov/medlineplus/druginfo/medmaster/a694007.html>.

diagnosis of somatization disorder and instructed plaintiff to continue with Neurontin. (Tr. 200-01.)

Plaintiff visited Dr. Sanders on July 26, 2004, and complained of leg pain and tremors. It was noted that plaintiff had an upcoming appointment with neurologist Dr. Christina Lenk. (Tr. 353.)

In a note from Dr. Schneider's office dated July 30, 2004, it was noted that weekly messages had been left for plaintiff regarding her failure to appear for testing, and that no response had been received regarding these messages. (Tr. 202.)

Plaintiff returned to Dr. Schneider on August 6, 2004, and reported that she was on temporary disability. It was noted that plaintiff's dosage of Neurontin had been increased and that plaintiff had not yet had an EMG study. Plaintiff reported increased pain in her legs in the past months and expressed concern that she had MS. It was noted that plaintiff was scheduled to see Dr. Lenk in ten days. Physical examination was normal. Dr. Schneider continued in his diagnosis of somatization disorder and expressed doubt that plaintiff had MS. A repeat MRI was considered. Plaintiff was instructed to keep her appointment for neurological consultation. (Tr. 198-99.)

Plaintiff visited neurologist Dr. Christina N. Lenk on August 17, 2004, for evaluation for possible MS. (Tr. 328-30.) Dr. Lenk reviewed plaintiff's medical history and noted plaintiff's

current complaints of weakness in her left leg and arm with occasional difficulty with walking. Plaintiff reported her left leg to drag when she walks. Plaintiff also reported intermittent head tremor which resolves if someone hugs her. It was noted that plaintiff currently swam for exercise and experienced no limitations in the activity. (Tr. 328.) Plaintiff's medications were noted to be Neurontin, Vicodin, Robaxin,[14] and Naproxen.[15] Plaintiff's employment was noted to be as a tow motor operator. Physical examination was unremarkable. Neurological testing showed give-way weakness in both upper and lower extremities, but was otherwise unremarkable. Sensory examination was intact, strength was noted to be 5/5, and plaintiff was able to ambulate without difficulty on heels, toes, and in tandem. (Tr. 329.) Upon review of the physical examination and previous diagnostic tests, Dr. Lenk opined that plaintiff did not have MS. Dr. Lenk also opined that plaintiff's symptoms were unrelated to an electrical shock received prior to their onset. Dr. Lenk noted plaintiff to be tearful and that she wanted to be given a diagnosis of MS. Dr. Lenk determined to order additional tests and to review additional records. (Tr.

---

[14]Robaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 2716 (55th ed. 2001).

[15]Naproxen is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain. Physicians' Desk Reference 2744-45 (55th ed. 2001).

330.)

Plaintiff was admitted to the emergency room at St. Luke's Hospital on August 30, 2004, for tremors. It was noted that although plaintiff's tremors were generalized, they were mostly confined to plaintiff's head and neck. Plaintiff's speech was noted to be slow. Plaintiff was given Neurontin, Vicodin, and Flexeril.[16] During an EEG test, plaintiff experienced two episodes of head tremors with intermittent episodes of head/body tremors. The occasional tremors were noted to be associated with muscular artefact not typical of cerebral activity. (Tr. 221-30.)

Plaintiff returned to Dr. Sanders on September 7, 2004, and complained of bilateral leg pain. It was noted that plaintiff was hospitalized the previous week and was taking Neurontin. (Tr. 352.) Plaintiff reported the Neurontin to help with her tremors, but that she continued to experience tremors all over, as well as pain from head to toe, numbness, and tingling. Plaintiff reported Flexeril not to help her muscle spasms or pain. Physical examination showed plaintiff's ambulation to be slow and limping. Calf muscles were slightly tender to palpation. Plaintiff had normal strength, sensation, reflexes, and cerebellar exam and gait. No tremors were noted. Plaintiff was instructed to continue with

---

[16]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1929 (55th ed. 2001).

Neurontin and to take Diazepam.[17]  (Tr. 351.)

MRI's of the brain and cervical spine performed on September 10, 2004, were negative.  (Tr. 252, 253.)

On September 17, 2004, plaintiff visited Dr. Sanders for a spider bite.  It was noted that plaintiff was taking Diazepam and Robaxin.  Keflex, an antibiotic, was prescribed.  (Tr. 350.)

From October 27 through November 2, 2004, plaintiff visited the Mayo Clinic in Scottsdale, Arizona, for evaluation of her symptoms.  Multiple tests and examinations failed to reveal any physiological cause of plaintiff's symptoms.  Throughout her examinations, plaintiff reported a history of fatigue with frequent falling asleep during the day, infrequent double vision, difficulty speaking, vertigo and loss of balance, lightheadedness, leg and hip pain, limb stiffness, leg and arm weakness, paresthesias and numbness, and head tremor.  (Tr. 255-79.)  Plaintiff reported the intermittent and remitting nature of her condition since its onset in October 2000, but described the recurrence and persistence of her symptoms since July 2004.  It was noted that plaintiff's temporary disability ended on October 27, 2004, and that plaintiff was seeking total disability.  (Tr. 265.)  Physical examinations yielded inconsistent results.  Plaintiff's gait was noted to be functional astasia, abasia with tearfulness due to the level of pain; however, it was noted that plaintiff could rise on her toes

---

[17]Diazepam is used to relieve anxiety and muscle spasm. Physicians' Desk Reference 2814 (55th ed. 2001).

and heels.  It was noted that plaintiff appeared to have a volitional tremor of the head and arms while walking; however, with distraction during the course of the examination, the tremor disappeared.  Plaintiff was unable to lift her left leg to perform a diagnostic maneuver, due to severe pain in her thigh; however, plaintiff was able to extend her knee fully, her quadriceps were examined without discomfort, and hip flexor movements were normal. It was noted that plaintiff was quite dramatic and tearful, describing pain throughout the examination.  (Tr. 258.) Neurologist Alan Yudell opined that plaintiff's examination and symptoms were compatible with somatoform disorder, to which plaintiff appeared hostile in response. (Tr. 258-59.) Dr. John A. Freeman likewise opined that there was no specific musculoskeletal component to plaintiff's pain and disability.  Dr. Freeman noted that myofascial pain was difficult to treat.  He prescribed nortriptyline[18] and instructed plaintiff to continue with Neurontin. Dr. Freeman further instructed plaintiff to discontinue Vicodin, Ultram and Robaxin, and to take Tylenol Arthritis.  Dr. Freeman opined that plaintiff could benefit from a psychological consultation for coping mechanisms, as well as from physical therapies and a work hardening program.  (Tr. 268.)  The final report of plaintiff's evaluation at Mayo Clinic included a summary

---

[18]Nortriptyline is an antidepressant used to treat depression but may also be used to treat post-herpetic neuralgia.  <u>Medline Plus</u> (last reviewed Sept. 1, 2008)<<u>http://www.nlm.nih.gov/</u> medlineplus/druginfo/medmaster/ a682620.html>.

of discussions with plaintiff regarding her concern that the presence of plastics at her last place of employment may be related to her symptomology, which Dr. Robert R. Orford was of the opinion that it was not. Plaintiff also questioned whether an electrical shock sustained by her a few months prior to the onset of her symptoms in October 2000 could have caused these symptoms, in response to which Dr. Orford noted that a physician in Florida appeared to specialize in such occurrences and suggested that plaintiff contact him for consultation or referral. Plaintiff also requested that she see an MS specialist, but was informed that one was unavailable until the following week. It was noted that results from previous testing for MS were negative. Dr. Orford also noted that all tests for lupus were within the normal range, despite plaintiff's concern regarding the statistically significant number of women at her former workplace who had been diagnosed with the condition. (Tr. 256.)

Plaintiff returned to Dr. Sanders on November 16, 2004, and reported on her recent visit to Mayo Clinic. Dr. Sanders noted that plaintiff and her sister refused to believe that plaintiff did not have something more significant than somatoform disorder and myofascial pain syndrome. Dr. Sanders noted plaintiff's current medications to be Nortriptyline, Neurontin, and Aleve. Physical examination showed plaintiff to have mild diffused pain in most of the muscle groups. Neurological examination was normal when

plaintiff did the exercises. Dr. Sanders opined that plaintiff had probable cystitis and myofascial pain syndrome versus somatoform disorder. Dr. Sanders noted plaintiff to do physical therapy and warm pool therapy. Dr. Sanders reassured plaintiff that there was no specific medical condition, but it was noted that plaintiff was "un-reassured." Plaintiff was given a trial of Nortriptyline and was instructed to return in three or four months. (Tr. 348.)

Dr. Sanders examined plaintiff on December 22, 2004, for disability update in relation to plaintiff's body aches and tremors. It was noted that plaintiff had been diagnosed with somatoform disorder by the Mayo Clinic and was doing a little better on Nortriptyline. Plaintiff reported that she had normal activity and energy levels, but that she walked with a wobbly and unsteady gait, and had tingling and tremors all over. Physical examination was normal. Neurological examination showed sensation to be normal to touch, pinprick, and vibration. No tremor was noted and no cerebellar signs were present. Straight leg raising was within normal limits. Deep tendon reflexes were 2+/4 and symmetrical. (Tr. 345.) Psychiatric assessment showed plaintiff to have impaired insight, but to have appropriate judgment, mood and affect. Plaintiff also had normal rate of speech with normal articulation and spontaneity. (Tr. 346.) Dr. Sanders diagnosed plaintiff with somatoform disorder and fibromyalgia. Plaintiff was continued on Nortriptyline and was given instruction as to diet and

exercise.  Plaintiff was instructed to return in three months. (Tr. 346.)

Plaintiff visited SLUCare on January 25, 2005, and complained of having tremor and of having pins-and-needles sensations over her entire body.  Plaintiff reported that she experienced an electrical shock in August 2000 after which she starting waking up in September 2000 with paresthesias in the occipital area.  Plaintiff reported the sensation to spread to her four limbs in October 2000 and that her thinking became clouded at work at that time.  Plaintiff reported the symptoms to have resolved in April 2001, and that they reoccurred on an intermittent basis in February 2003.  Finally, plaintiff reported the symptoms to have reoccurred in July 2004, and that she has experienced constant numbness, tingling, head and limb tremor, twitching, and decreased balance since that time.  (Tr. 282.)  Physical examination showed muscle strength to be 5/5 in the upper and lower extremities.  Muscle tone was normal.  Plaintiff's gait was noted to be normal in stance, heel, toe, tandem, and swing.  Sensation was noted to be decreased in her fingers versus her elbows, but was otherwise within normal limits. (Tr. 285.)  Overall, plaintiff's examination was determined to be normal.   It was noted that plaintiff was considering the University of Chicago's Electrical Trauma Program.  (Tr. 286.)

Plaintiff returned to Dr. Sanders on March 31, 2005, for

follow up evaluation. Plaintiff reported no significant change in her pain but reported the pain to increase with walking. Plaintiff reported the pain to have been better the previous year with swimming. Plaintiff requested that Nortriptyline be discontinued. As to plaintiff's fibromyalgia, it was noted that such condition had not changed. No complications were noted from her medication. Plaintiff reported tingling sensations and that she experienced numbness. Plaintiff reported no decrease in her concentration ability. Plaintiff reported that she drags one foot when she walks and that she walks with shuffling steps. Physical examination showed mild diffuse tenderness in many muscle groups, but no swelling or warmth. Neurologic examination was normal. Nortriptyline was discontinued. Cymbalta[19] was prescribed. Plaintiff was instructed as to diet and exercise, and was further instructed to return in four months. (Tr. 344.)

On May 19, 2005, A. Tayob, a medical consultant for disability determinations, completed a Physical Residual Functional Capacity Assessment. (Tr. 146-53.) In this assessment, it was opined that plaintiff could occasionally lift and/or carry fifty pounds, and frequently lift and/or carry twenty-five pounds. It was opined that plaintiff could stand and/or walk for a total of

---

[19]Cymbalta is used to treat depression and generalized anxiety disorder, as well as pain and tingling caused by diabetic neuropathy and fibromyalgia. Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. It was further opined that plaintiff had no limitations in her ability to push and/or pull. (Tr. 147.) As to plaintiff's postural limitations, it was opined that plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. It was opined that plaintiff could occasionally climb ladders, ropes and scaffolds. (Tr. 148.) It was further opined that plaintiff should avoid moderate exposure to hazards, such as machines and heights, due to tremors. (Tr. 150.) It was opined that plaintiff had no manipulative, visual or communicative limitations. (Tr. 149-50.)

In a letter dated May 30, 2005, and addressed to "Whom It May Concern," Dr. Lenk wrote that none of plaintiff's evaluations revealed any evidence to support a diagnosis of MS and, further, that she did not believe plaintiff's symptoms to be related to previous electrical shock. (Tr. 327.)

On June 13, 2005, Psychologist Sherry Bassi completed a Mental Residual Functional Capacity Assessment for disability determinations, wherein she opined that plaintiff was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others

without being distracted by them, to make simple work-related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, and to be aware of normal hazards and take precautions. Dr. Bassi further opined that plaintiff was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods, and to set realistic goals or make plans independently of others. (Tr. 128-29.) Dr. Bassi concluded that, based on her diagnosed mental condition, plaintiff could understand, remember, carry out, and persist at simple tasks; make simple work-related judgments; relate adequately to coworkers and supervisors; and adjust adequately to ordinary changes in work routine and setting. (Tr. 130.)

On that same date, June 13, 2005, Dr. Bassi also completed a Psychiatric Review Technique Form (PRTF) for disability determinations. (Tr. 132-45.) It was noted that Dr. Bassi was reviewing plaintiff's medical records for evaluation of Listing

12.07, Somatoform Disorders.  (Tr. 132, 138, 142.)  Upon review of the medical evidence of record, Dr. Bassi opined in the PRTF that plaintiff's somatoform disorder was a medically determinable impairment, but that such disorder did not satisfy the diagnostic criteria of the Listing.  (Tr. 138.)  With respect to functional limitations plaintiff experienced as a result of somatoform disorder, Dr. Bassi opined that plaintiff was mildly limited in the domains of Activities of Daily Living and Maintaining Social Functioning; and moderately limited in the domain of Maintaining Concentration, Persistence or Pace.  Dr. Bassi further opined that plaintiff had no extended episodes of decompensation.  (Tr. 142.)

Plaintiff visited Dr. Sanders on February 3, 2006, and complained of continued pain in her legs and numbness in her head. Plaintiff reported having difficulty walking, especially with the left leg.  Plaintiff also reported the tingling in her scalp to sometimes be very painful.  Plaintiff reported experiencing memory loss.  Plaintiff's medications were noted to include Neurontin, Vicodin, and Cymbalta.  Plaintiff reported feeling fatigued and of having decreased energy level.  It was noted that plaintiff had gained weight.  Physical examination was essentially normal.  Dr. Sanders noted apparent weakness in the left knee with give-way weakness noted.  Dr. Sanders continued in the diagnosis of somatoform disorder and noted that plaintiff was to be referred for neuropsychological testing as recommended by the Mayo Clinic, but

had not followed up.  Plaintiff was prescribed Cymbalta and Restoril[20] for fibromyalgia, and was referred to physical therapy for evaluation and treatment.  With regard to plaintiff's numbness and tingling sensation, Dr. Sanders noted this to be associated with plaintiff's somatoform disorder.  Dr. Sanders noted that plaintiff persisted in wanting to believe that electrical injuries contributed to this condition.  Plaintiff was referred to a psychologist for neuropsychological testing.  (Tr. 342.)

On March 16, 2006, plaintiff attended a physical therapy session at St. John's Mercy Medical Center and complained of a two-year history of her left leg dragging with loss of control. Plaintiff reported the symptoms to have gradually worsened. Plaintiff reported that her leg was "sore and achy" and complained that it was tight and had a burning sensation.  Plaintiff rated her pain at a level four to nine on a scale of one to ten, and described it as constant.  Plaintiff's medications were noted to include Neurontin, Cymbalta, and Trazodone.[21] Plaintiff's gait was markedly antalgic.  Decreased left hip flexion was noted, as well as decreased left knee extension.  Flexibility of the lower extremities was noted to be markedly decreased bilaterally.  Faber

[20]Restoril is used on a short-term basis to treat insomnia. Medline Plus (last revised Oct. 1, 2008)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684003.html>.

[21]Trazodone is used to treat depression.  It is also sometimes used to control abnormal, uncontrollable movements.  Medline Plus (last  revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a681038.html>.

test and Stork test were noted to be positive on the left. It was noted that plaintiff experienced marked difficulty in performing sit-stand exercises as well as going up a flight of stairs due to increased symptoms in the lower extremities. It was noted that plaintiff's potential for rehabilitation was fairly good given plaintiff's motivation. Short and long term goals were set, and plaintiff was scheduled to participate in physical therapy two to three times a week for four weeks. (Tr. 339.)

Between March 16 and March 30, 2006, plaintiff appeared for physical therapy on five occasions. (Tr. 378-81.) On March 30, 2006, it was noted that plaintiff had met all of her short-term and long-term therapy goals. Plaintiff reported that her pain had decreased to a level zero with her home exercise program, but that she experienced some "achy" pain her back which ranged from zero to four. Plaintiff experienced no pain with palpation. Plaintiff's range of motion had improved. Plaintiff reported that she had no difficulty performing sit/stand functions as well as with prolonged ambulating or standing, or with going up and down one flight of stairs. Plaintiff was noted to ambulate without any gait deviation. It was noted that plaintiff had a slight instability in the sacroiliac joint that referred symptoms into the hip area, but it was opined that continued trunk strengthening would result in further progress. Plaintiff was discharged from physical therapy on March 30, 2006, with instruction to continue with the home

exercise program.  (Tr. 378.)

Plaintiff visited Dr. Sanders on May 2, 2006.  Plaintiff reported that she continued to experience numbness in her head but that it was better.  Plaintiff reported that the condition was severe for three days the previous week.  Plaintiff stated that she wanted to return to work.  Plaintiff's current medications were noted to be Neurontin, Vicodin, Trazadone, and Cymbalta.  Review of systems showed plaintiff to have a normal activity and energy level.  Plaintiff had no heat or cold intolerance, or dyspnea.  It was noted that plaintiff exercised weekly.  Physical examination was unremarkable.  Plaintiff was diagnosed with peripheral enthesopathies and allied syndromes.  Plaintiff's prescription for Cymbalta was refilled.  Plaintiff was instructed to return in four months.  (Tr. 452-53.)

Plaintiff visited gynecologist Dr. Jay Padratzik on June 21, 2006, complaining of cramps and lower abdominal pain. Plaintiff's past medical history was noted to include tremors. Plaintiff's medications were noted to be Neurontin, Trazadone, and Cymbalta.  Plaintiff was prescribed Motrin and a urology evaluation was ordered.  (Tr. 442.)

On June 30, 2006, Dr. Padratzik prescribed Darvocet[22] for plaintiff.  Later that same date, plaintiff reported to Dr. Padratzik that Darvocet was not helping her pain.  Vicodin was then

---

[22]Darvocet is used to relieve mild to moderate pain. <u>Physicians' Desk Reference</u> 1708-09 (55th. ed. 2001).

prescribed.   Upon being notified that date that Vicodin did not help plaintiff's pain, Dr. Padratzik advised plaintiff to go to an emergency room.  (Tr. 446.)

On June 30, 2006, plaintiff was admitted to the emergency room at St. John's Mercy Medical Center complaining of lower abdominal pain and nausea.  Plaintiff reported the pain to be sharp and constant and to be at a level six on a scale of one to ten.  A CT scan of the abdomen and pelvis showed no abnormality.  Plaintiff was given morphine and Toradol for pain.  Plaintiff was discharged that same date.   Discharge medications included ibuprofen and Percocet for pain.  (Tr. 411-25.)

Plaintiff was admitted to St. John's Mercy Medical Center on July 20, 2006, and underwent transabdominal hysterectomy. Plaintiff's medical and social history upon admission was noted to include a history of tremors and an electrical injury sustained at work in 2000.   Plaintiff's current medications were noted to be Neurontin and Trazodone.   It was also noted that plaintiff used marijuana for pain.   Plaintiff tolerated the surgical procedure well and was discharged on July 22, 2006, in good condition.  (Tr. 387-410.)

Plaintiff returned to Dr. Padratzik on August 4, 2006, for follow up from her recent surgery.  Plaintiff reported having no pain.   Dr. Padratzik instructed plaintiff to increase her activity and to return for follow up in one month.  (Tr. 433.)

Plaintiff returned to Dr. Padratzik for follow up on August 23, 2006. It was noted that plaintiff wanted to play volleyball. Plaintiff complained of symptoms associated with urinary tract infection. An antibiotic was prescribed and a urine culture was ordered. (Tr. 432.)

In a treatment noted dated August 25, 2006, Dr. Padratzik prescribed Darvocet for plaintiff. No reason for such prescription is indicated in the note. (Tr. 431.)

Plaintiff returned to Dr. Sanders on September 5, 2006, and complained of tremors, losing balance, head numbness, and tingling sensations. Plaintiff reported that her symptoms always appear when she is overheated. Plaintiff reported that she experiences these symptoms several times daily for up to an hour. Plaintiff reported that she has difficulty standing and bending over and must lie down during these episodes. Plaintiff also reported having head tremors and muscle twitching in her upper and lower extremities. Physical examination, including range of motion, musculoskeletal and sensory examinations, were normal. Dr. Sanders diagnosed plaintiff with skin sensation disturbance and tremor familial. Noting the persistence of plaintiff's tremors, which were currently associated with muscle fasciculations, Dr. Sanders referred plaintiff for evaluation of possible movement disorder. Dr. Sanders opined that plaintiff was unable to work in any occupation due to her persistent neurologic symptoms. (Tr.

449-51.)

On October 5, 2006, Dr. Sanders completed a Physician's Assessment for Social Security Disability Claim in which he reported plaintiff's current diagnoses to be tremors, fibromyalgia, paresthesias, syncope, and fatigue. Dr. Sanders reported that plaintiff's tremors and fatigue limit any activity and that plaintiff's tingling is present at all times. Dr. Sanders stated that plaintiff's tremors and being mildly off balance constituted pertinent clinical or laboratory findings supporting his diagnoses. With respect to plaintiff's endurance, Dr. Sanders stated that plaintiff needed to rest three to four hours out of an eight-hour workday, and noted that any overheating is associated with an increase in plaintiff's symptoms. Dr. Sanders opined that the combination of plaintiff's impairments prevented her from substantial gainful employment at the sedentary level. (Tr. 448.)

## IV.  The ALJ's Decision

The ALJ found plaintiff to have met the insured status requirements of the Social Security Act on July 20, 2004, and that she had not engaged in substantial gainful activity since that time. The ALJ found plaintiff to have somatoform disorder but that she did not have an impairment or combination of impairments which met or medically equaled an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations of disabling symptoms not to be persuasive. The ALJ

found plaintiff to have the residual functional capacity (RFC) to perform the requirements of work except for lifting more than fifty pounds occasionally and twenty-five pounds frequently. The ALJ determined plaintiff able to sit six hours out of an eight-hour workday; stand and/or walk six hours out of an eight-hour workday; and occasionally climb ropes, ladders and scaffolds. The ALJ determined that plaintiff must avoid moderate exposure to moving and dangerous machinery and to unprotected heights. The ALJ determined that plaintiff could remember, understand and carry out at least simple instructions and non-detailed tasks; and could perform some complex tasks as well. The ALJ found plaintiff's impairments and functional limitations to prevent plaintiff from performing her past relevant work. Considering plaintiff's age, education, work experience, and functional limitations, the ALJ determined plaintiff able to perform other work that exists in significant numbers in the national economy, as testified to by the vocational expert. The ALJ thus found plaintiff not to be under a disability. (Tr. 20-22.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The

Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart

P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and
     consulting physicians.

4.   The plaintiff's subjective complaints
     relating to exertional and non-exertional
     activities and impairments.

5.   Any corroboration by third parties of the
     plaintiff's impairments.

6.   The testimony of vocational experts when
     required which is based upon a proper
     hypothetical question which sets forth
     the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86
(8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85
(8th Cir. 1989)).


The Court must also consider any evidence which fairly detracts

from the Commissioner's decision.   <u>Coleman</u>, 498 F.3d at 770;

<u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).   However,

even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by

substantial evidence on the record as a whole.   <u>Pearsall</u>, 274 F.3d

at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir.

2000)).   "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the

record could also have supported an opposite decision." <u>Weikert v.</u>

<u>Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation

marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v.</u>

<u>Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ failed in his decision to consider whether plaintiff's impairment met Listing 12.07 – Somatoform Disorders. Plaintiff argues that her impairment meets Listing 12.07 and thus that she is entitled to benefits. In the alternative, plaintiff requests that the matter be remanded to the Commissioner for a proper determination of whether her impairment meets or equals Listing 12.07.

At the outset of his written decision, the ALJ found plaintiff to have somatoform disorder. The ALJ then wrote, "However, as established below the undersigned finds that the claimant's impairment does not meet, or equal in duration or severity, the criteria established under the appropriate listings in Appendix 1, Part 404, Subpart P." (Tr. 13.) Although Listing 12.07 governs somatoform disorders, the ALJ did not specifically refer to Listing 12.07 in his decision, nor methodically discuss its specific criteria. However, as long as substantial evidence in the record supports an ALJ's conclusion that a claimant's impairment(s) does not meet or equal the relevant listing(s), the failure to elaborate on the specific listing is not reversible error. <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 649 (8th Cir. 2004) (citing <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1037 (8th Cir. 2001); <u>Briggs v. Callahan</u>, 139 F.3d 606, 609 (8th Cir. 1998)). Nevertheless, a review of the ALJ's decision in its entirety shows

the ALJ to have thoroughly considered the evidence on the record as a whole as it related to the specific medical criteria of Listing 12.07. For the following reasons, substantial evidence on the record as a whole supports the ALJ's determination that plaintiff's somatoform disorder did not meet or equal the relevant listing.

Somatoform disorders manifest themselves in "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07 (2006). To meet the listing level severity for a somatoform disorder, a claimant is required to satisfy the criteria set out in both A and B of the listing, and specifically:

> A. Medically documented by evidence of one of the following:
>
> > 1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
> >
> > 2. Persistent nonorganic disturbance of one of the following:
> >
> > > a. Vision; or
> > >
> > > b. Speech; or
> > >
> > > c. Hearing; or
> > >
> > > d. Use of a limb; or
> > >
> > > e. Movement and its control (e.g., coordination disturbance, psycho-genic seizures, akinesia, dyskine-sia; or

f.  Sensation (e.g., diminished or heightened).

3.  Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

Id.

A social security claimant bears the burden of demonstrating that the specific criteria of a listing are met.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004); Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004).  Where, as here, a listing requires proof of particular functional limitations, i.e., the "B" criteria, there must be medical evidence of said limitations.  Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007).  Where a claimant fails to present sufficient medical evidence demonstrating that her functional limitations are "marked" or rise to such a degree that she is unable to function satisfactorily, an ALJ may conclude that

the listing is not satisfied.  Id.

In his written decision, the ALJ here discussed the extensive nature of plaintiff's symptoms, her repeated and wide-ranging efforts to obtain diagnoses for her condition, and the various treatments provided in efforts to control the symptoms. The ALJ also discussed the results of multiple diagnostic tests and examinations which showed there to be no medically determinable cause for plaintiff's various symptoms or demonstrated etiology of her complaints.  The ALJ also discussed the observations made by multiple physicians relating to whether, and to what extent, plaintiff's reported symptoms affected her physical abilities.  As noted by the ALJ, despite plaintiff's subjective complaints of functional limitations, the various physicians repeatedly and objectively observed plaintiff not to be so limited.[23]

Assuming arguendo that plaintiff's somatoform disorder meets the diagnostic criteria to satisfy part A of Listing 12.07, a review of the medical evidence of record shows plaintiff's impairment not to result in functional limitations to such a degree that the B criteria are satisfied.  In reaching his adverse

_____

[23]To the extent Dr. Sanders opined otherwise in his October 2006 Physician's Assessment, the ALJ did not err in according this opinion little weight (Tr. 18) inasmuch as the limitations described by Dr. Sanders to prevent work stand alone and were not mentioned in his numerous records or treatment notes.  Nor were these findings supported by any objective testing or reasoning. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  See also Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004); Sultan v. Barnhart, 368 F.3d 857, 863-64 (8th Cir. 2004); Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004).

decision, the ALJ relied in part on the PRTF completed by Dr. Bassi for disability determinations in June 2005. As discussed supra, Dr. Bassi opined in this PRTF that plaintiff was only mildly or moderately limited in her functional abilities, and experienced no extended episodes of decompensation. Substantial evidence on the record as a whole supports this determination.

With respect to activities of daily living, the medical evidence shows Dr. Sanders to have observed plaintiff in December 2004 to be engaging in normal activities and to have a normal energy level. Plaintiff did not see a physician regarding her impairment from March 2005 to February 2006. In May 2006, Dr. Sanders observed plaintiff to be engaged in normal activity and to have a normal energy level. In August 2006, plaintiff reported to Dr. Padratzik that she wanted to play volleyball. In addition, the ALJ noted that plaintiff was able to engage in work activity prior to her alleged onset of disability in July 2004 despite having symptoms of the same type and degree during such period of work, with no objective evidence of a worsening of such symptoms since July 2004. Indeed, a review of the record shows reports of improvement in plaintiff's condition. Further, in Function Reports completed by plaintiff and her sister, it was reported that plaintiff engages in housecleaning, drives, attends her children's school events and activities, shoots pool, prepares meals, shops, plays computer games, cares for her pet and children, and plants

flowers.    (Tr. 108-16, 117-24.)    In her testimony at the administrative hearing, plaintiff testified to frequent fishing outings in the summertime.  Although plaintiff may experience some limitations in her ability to perform daily activities, the record nevertheless fails to show plaintiff to be markedly restricted in this domain.  See Weikert, 977 F.2d at 1253 (daily activities of driving, housekeeping chores, yard work, shopping, keeping medical appointments, engaging in hobbies, using the public library, and using public transportation, shows only slight limitation of ability).

        With respect to social functioning, the record shows plaintiff to be engaged, and to have no difficulties with coworkers, family or friends.  (Tr. 112, 122.)  Plaintiff's sister reports that plaintiff attends her children's social events, participates in chat rooms on the computer, and socializes with her friends by telephone and in person.  (Tr. 112.)  The record fails to show that plaintiff is unable to function satisfactorily in the domain of social functioning.   See Weikert, 977 F.2d at 1253 (record fails to show that claimant, who maintains a group of friends and is happily married, has any serious dysfunction in social relationships).

        The record likewise shows plaintiff not to be markedly limited in the domain of concentration, persistence or pace. Function Reports and plaintiff's testimony shows her to be

substantially engaged in computer activities and to manage her own finances. Plaintiff's sister also reports that plaintiff helps her children with homework. (Tr. 109.) In March 2005, plaintiff reported to Dr. Sanders that she experienced no decrease in her concentration ability. Although plaintiff reports that she experiences some limitations in her memory and ability to concentrate when she experiences numbness in her head, the record shows plaintiff to have engaged in work activity during a period of years when experiencing this same symptom, and no objective evidence shows the condition to have worsened. The medical evidence of record fails to show plaintiff to be markedly limited in this domain.

Finally, there is no medical evidence demonstrating that plaintiff suffered repeated episodes of decompensation, each of extended duration. "The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4) (2006). Although the record shows plaintiff to have periodically experienced an exacerbation of symptoms, there is no medical evidence demonstrating that such exacerbations were of listing level severity.

Accordingly, upon review of the evidence of record as a whole, there is substantial evidence to support the ALJ's

conclusion that plaintiff's somatoform disorder did not meet or equal the relevant listing. Plaintiff failed to satisfy her burden of demonstrating, with medical evidence, that her impairment meets the criteria set out in part B of Listing 12.07, and specifically, that her impairment results in functional limitations of such a degree to be considered "marked" or results in her inability to function satisfactorily.

To the extent plaintiff challenges the ALJ's adverse credibility determination, a review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).

The undersigned notes that in cases involving somatoform disorders, "an ALJ is not free to reject subjective experiences without an express finding that the claimant's testimony is not credible." Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995). The ALJ made such an express finding here. Contrary to plaintiff's assertion, the ALJ considered more than just the lack of objective medical evidence in finding plaintiff not to be credible. Indeed,

applying the _Polaski_ criteria to plaintiff's subjective complaints, the ALJ considered plaintiff's level of activity, the lack of functional restrictions imposed by her physicians, her ability to work for a period of years with the alleged disabling symptoms, the lack of treatment or prolonged care subsequent to the alleged onset of disability, and the lack of documented adverse side effects of medications. (Tr. 13, 17, 19.) Because the ALJ's credibility determination is supported by substantial evidence on the record as a whole, the Court is bound by this determination. _Robinson v. Sullivan_, 956 F.2d 836, 841 (8th Cir. 1992); _see also_ _Metz_, 49 F.3d at 377.

## VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. _Gowell v. Apfel_, 242 F.3d 793, 796 (8th Cir. 2001); _Browning v. Sullivan_, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff is not

disabled should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE


Dated this _23rd_ day of September, 2009.